

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-17-00190-CV

JENNIFER LANE                                                          APPELLANT

V.

CHRISTINE H. PHARES                                                   APPELLEE

----------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 16-04838-16

----------

## OPINION

----------

This is a permissive interlocutory appeal from the trial court's dismissal of Appellant Jennifer Lane's defamation suit against Appellee Christine H. Phares. The trial court dismissed Lane's claims under the Texas Citizens Participation Act (TCPA), finding that the TCPA applied to Lane's claims, that Lane is a limited-purpose public figure, and that Lane did not establish that Phares made internet postings about Lane with actual malice.  *See* Tex. Civ. Prac. & Rem.

Code Ann. §§ 27.003, 27.008 (West 2015).  We granted Lane permission to appeal the trial court's dismissal order.  *See* Tex. R. App. P. 28.3.  Because Lane is a limited-purpose public figure and failed to produce clear and specific evidence that Phares published defamatory statements with actual malice, we affirm.

## I.    Background

Lane is an operatic singer and a voice professor at the University of North Texas (UNT).   Phares is a former student of Lane's at UNT.   Phares anonymously posted a comment on an online forum for classical singers, stating that Lane: (1) filed lawsuits against each of her former university employers and against UNT; (2) "loses an average of 3–4 students out of her studio per semester"; (3) "teaches in unhealthy ways [and] causes vocal problems"; and (4) "talks shit on singers and faculty in a serious way."   Phares also posted comments on the RateMyProfessors.com website stating that: (1) Lane's teaching methods caused documented vocal injury; (2) Lane is distracted and not focused during lessons, often on computers or her phone while a student is singing; (3) Lane is not organized and is often late to lessons; (4) Lane demeans students and is not respected by faculty, peers, or students; and (5) Lane has been on faculty probation.

Lane sued Phares and other unnamed defendants for defamation, a permanent injunction, and a request for a correction, clarification, or retraction under civil practice and remedies code section 73.055(d).  *See* Tex. Civ. Prac. &

Rem. Code Ann. § 73.055(d) (West 2017). Phares answered, filed a counterclaim for fraud, and filed a motion to dismiss under the TCPA. In the motion, she asserted that Lane's suit was based on, related to, or was in response to Phares's exercise of her rights to free speech and of association and that Lane is an all-purpose public figure, or at least a limited-purpose public figure. In response, Lane asserted that she is not a public figure, limited or otherwise, and that even if she is, Phares posted her online comments with actual malice.

After a hearing, the trial court granted Phares's TCPA motion to dismiss. In the dismissal order, the trial court found by a preponderance of evidence that Lane is a public figure and that her legal action is based on, relates to, or is in response to Phares's exercise of her rights of free speech and association. The trial court further found that Lane did not establish that Phares's comments were made with actual malice.

At Lane's request, the trial court made findings of fact and conclusions of law. The trial court found that Lane has chosen a career that regularly involves media attention and has invited public attention and that she has achieved notoriety and recognition in her community as both an opera singer and a professor. The trial court concluded that Lane is a public figure and that she did not establish that Phares acted with actual malice with regard to the internet postings. Upon Lane's further request, the trial court made the additional finding that Lane is a limited-purpose public figure.

Lane filed a petition seeking permission for this interlocutory appeal challenging the trial court's order, which we granted. *See* Tex. R. App. P. 28.3; *Lane v. Phares*, No. 02-17-00190-CV, 2017 WL 2807404 (Tex. App.—Fort Worth June 29, 2017, no pet.).

## II.     Dismissal under the TCPA

We review de novo a trial court's ruling on a motion to dismiss under the TCPA. *Dall. Morning News, Inc. v. Hall*, 524 S.W.3d 369, 374 (Tex. App.—Fort Worth 2017, pet. filed); *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 724–27 (Tex. App.—Houston [14th Dist.] 2013, pet. denied), *disapproved of on other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015). We construe the TCPA liberally to fully effectuate its purpose and intent. *Hotchkin v. Bucy*, No. 02–13–00173–CV, 2014 WL 7204496, at *1 (Tex. App.—Fort Worth Dec. 18, 2014, no pet.) (mem. op.) (citing Tex. Civ. Prac. & Rem. Code Ann. § 27.011(b) (West 2015)).

A plaintiff defeats a motion to dismiss under the TCPA by establishing by clear and specific evidence a prima facie case for each essential element of the plaintiff's claim. Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c) (West 2015). The requirement for "clear and specific evidence" means the plaintiff "must provide enough detail to show the factual basis for its claim." *Lipsky*, 460 S.W.3d at 590–91. For a defamation claim, a plaintiff must prove among other elements that the defendant published a false statement of fact and that the defendant did

4

so with the requisite degree of fault—with negligence if the plaintiff is a private figure or with actual malice if the defendant is a public figure. *Id.* at 591.

### III.    Public Figures and Defamation Law

Whether Lane is a public figure is a question of law. *See Neely v. Wilson*, 418 S.W.3d 52, 70 (Tex. 2013). "In this determination, federal, not state, standards apply." *Schofield v. Gerda*, No. 02-15-00326-CV, 2017 WL 2180708, at *12 (Tex. App.—Fort Worth May 18, 2017, no pet.) (mem. op.) (citing *Rosenblatt v. Baer*, 383 U.S. 75, 84, 86 S. Ct. 669, 675 (1966)).

There are two classes of public figures in the defamation context: (1) general-purpose public figures, "who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts," and (2) limited-purpose public figures, who are "public figures for a limited range of issues surrounding a particular public controversy." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). General-purpose public figures hold positions of persuasive power and influence, while limited-purpose public figures have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S. Ct. 2997, 3009 (1974); *see also Hoskins v. Fuchs*, 517 S.W.3d 834, 842 (Tex. App.—Fort Worth 2016, pet. filed) (stating that limited-purpose public figures "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved . . . invit(ing) attention and

5

comment"; "inject ( ) (themselves) or (are) drawn into a particular public controversy . . . assum(ing) special prominence in the resolution of public questions"; and "thrust (themselves) into the vortex of (a) public issue . . . (or) engage the public's attention in an attempt to influence its outcome.") (citations omitted). "[P]ublic figures effectively have assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention." *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273 (3d Cir. 1980).

We use a three-part test to determine whether a person is a limited-purpose public figure:

> (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;
>
> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and
>
> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Neely*, 418 S.W.3d at 70.

### IV. Lane Qualifies as a Public Figure under Defamation Law

### A. The Record Contains Conclusive Evidence Establishing Lane's Public-Figure Status

### 1. Lane's Professional Website

Lane maintains a personal website about her career. Phares included excerpts from the site as exhibits to her affidavit included with her TCPA motion to dismiss. According to the site, "[t]he press has described [Lane's] singing as

6

'clear, rich, plangent,' 'compelling and dramatic,' and possessing 'agility and charisma.'"  On her biography page on her website, Lane lists her many acclaimed public performances, stating that "[s]he has been featured by many of the most prestigious institutions and orchestras in the US and abroad," including the Metropolitan Opera, New York City Opera, San Francisco Opera, Opera Monte Carlo, Opera du Caen, and the San Francisco Symphony.  She also states that she "has over fifty CD recordings to her name on a wide variety of labels, as well as two films."

Lane's biography page on her personal website also mentions her distinguished teaching career, stating that she taught at the University of Kentucky-Lexington "before being recruited to [UNT] as Associate Professor." She states that before the University of Kentucky, she taught at Stanford and that she teaches regularly at summer workshops.  She states that her students have won awards from the Metropolitan Opera Council, the Orpheus Competition, the Holt Foundation, and the National Association of Teachers of Singing and have been admitted to graduate study at the Peabody Institute, the Royal Academy of Music/London, Indiana University, McGill, and Eastman.  She further states that "[a] number of them are enjoying active national and international opera, concert, and teaching careers."

The website additionally has a "Critical Acclaim" page where Lane sets out excerpts from positive press reviews of her performances drawn from reviews of operas she has appeared in across the country, including reviews from the

7

*Philadelphia Inquirer*, the *Cleveland Plain Dealer*, the *Chicago Tribune*, the *Washington Post*, the *Los Angeles Times*, TheaterJones.com, and several other arts-oriented websites. Lane's personal website also has pages with lengthy listings of her operatic roles, orchestra appearances, recitals, and discography, and a page dedicated to her voice teaching, discussing her teaching positions past and present and master classes she has taught.

### 2. Lane's Faculty Page on UNT's Website

Lane's faculty page on the UNT website is also included as part of the evidence supporting the motion to dismiss. The faculty page, after listing her contact information, begins with a statement that she was nominated for a Grammy in 2015 for one of her operatic roles. The page then notes the various institutions at which she has taught and states that she was an ensemble member on a Grammy-winning recording of a symphony performance with the New York Philharmonic. Next, the page asserts that many of her students are now successful professional singers and academics. Then the page states that Lane "is recognized internationally for her stunning interpretations of repertoire." The page notes that she performed a main role in a production of *Dido & Aeneas*, which was filmed for BRAVO Television and has been released on DVD, and that the DVD "is now used by universities nationwide in Humanities, Opera, Gender Studies[,] and other courses."

**3. Lane's Affidavit**

In Lane's affidavit submitted in response to the motion to dismiss, she swore to the following statements regarding her career achievements:

> 5.    Over the course of my career in vocal performance and operatic singing, I have garnered a reputation as an excellent singer. I began singing professionally in 1972. I have performed in opera and concert with the Tanglewood Festival, Boston Early Music Festival, the New Getty Center, the Frick Collection, Opernhaus Halle, Opernhaus Dessau, Utah Opera, Salzburger Bachgesellschaft, Seattle Baroque Orchestra, Jerusalem Symphony, St. Louis Symphony, Orchestra della Toscana, and the New York City Opera, where I performed over twenty roles, including Amastre in its acclaimed production of Handel's Xerxes, voted opera production of the year by USA Today.
>
> 6.    In 2015, I was nominated for a Grammy award for my role (Athena) in Milhaud's *Orestie.*
>
> 7.    I am an ensemble member on the Grammy-winning Deutsche Grammophon recording of Mahler's Symphony No. 3, with the New York Philharmonic, conducted by Leonard Bernstein.
>
> . . . .
>
> 10. While my operatic performances have been reviewed by various opera critics, none of these reviews have pertained to any part of my life aside from the particular performance that the critic reviewed. . . . .
>
> 11. I have never been the subject of a news article specifically about me or one of my operatic performances that was not also about the work performed or the work to be performed and did not also cover other individuals involved in the performance.
>
> 12. I have never been the subject of an article in Time Magazine or Life Magazine. I have never appeared on any national radio or television talk show.
>
> 13. My Internet presence is limited to my professional website, my faculty profile page on UNT's website, my LinkedIn account, and my Facebook page.

She further swore that she has never held a press conference and has no fan websites devoted to her, that no member of the press has reported on what people are saying about her accomplishments or her teaching positions, and that she is not a household name and not a celebrity.

### 4. Phares's Affidavit

In Phares's affidavit supporting the motion to dismiss, she averred that when Lane was trying to recruit her to her studio at UNT, "both in person and on the telephone, [Lane] mentioned her career and how well connected she is due to her performance career." Phares looked up Lane's personal website and faculty page and "found her lengthy resume to be impressive and felt that her connections within the opera world could be beneficial to [Phares] in the future." She further stated that when she was auditioning for different schools prior to enrolling at UNT, students normally sat in the hallways and talked before their auditions, and in these talks students would ask each other which teacher they studied with "and then proceed to speak of that teacher." When Phares mentioned Lane, other students at the auditions would tell her that Lane had a reputation for suing each of her former university employers. According to Phares, this conversation happened at multiple auditions with other students.

### 5.      Phares's Deposition

In Phares's deposition,[1] she testified that after she started at UNT, a friend was looking at graduate schools, and as a potential student he took a lesson with Lane and another UNT voice professor.  Afterward, Lane called Phares to ask which teacher Phares's student friend liked better, and Lane "reminded [Phares] of [her] stature" and asked Phares to tell her student friend how much Phares liked her lessons with Lane.

Phares also further testified, as discussed more below, that the conversations about Lane suing her employers that she had heard at auditions continued after she enrolled at UNT.  According to Phares, once she became a UNT student, when she went to auditions for various programs, if she told other students that Lane was her teacher, the students at those auditions would tell her those same rumors about Lane filing lawsuits against her employers.  At one audition, she was told that Lane had problems at other schools with students wanting to leave.

### B.      Lane is a Public Figure

*First*, the evidence in the record demonstrates a public controversy about Lane's role as a university voice teacher.  "[A] public controversy is a dispute that

---

[1]In ruling on a TCPA motion to dismiss, the trial court generally considers the pleadings and supporting and opposing affidavits.  Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a) (West 2015).  However, the trial court may allow specific, limited discovery relevant to the motion, and the trial court allowed such discovery in this case, including allowing Lane to conduct a three-hour deposition of Phares.  *Id.* § 27.006(b).

11

in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980). "'To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question.'" *McLemore*, 978 S.W.2d at 572 (quoting *Waldbaum*, 627 F.2d at 1297). Here, students were talking about the issue, and the issue affected more than just Lane and Phares, the immediate participants in the controversy, because it dealt with a professor's fitness for, and performance of, her role as a teacher, which affects any potential or current UNT voice student.

*Second*, Lane had more than a trivial or tangential role in the public controversy. In determining Lane's role in the controversy, we consider such factors as whether: (1) she actually sought publicity surrounding the controversy; (2) she had access to the media; and (3) she "voluntarily engag(ed) in activities that necessarily involve(d) the risk of increased exposure and injury to reputation." *McLemore*, 978 S.W.2d at 573 (quotation marks and citation omitted). Lane "either must have been purposely trying to influence the outcome or could realistically have been expected, because of [her] position in the controversy, to have an impact on its resolution." *Waldbaum*, 627 F.2d at 1297.

The record conclusively shows that, as the trial court found, "Lane has chosen a career that regularly involves media attention and has invited public attention." There is no question that Lane, in her career, has "invite[d] attention

12

and comment." *Gertz*, 418 U.S. at 345, 94 S. Ct. at 3009 (stating that public figures "invite attention and comment"). Certainly, students outside of UNT knew of Lane as a voice teacher. Indeed, Lane's own affidavit asserts that she has a reputation as an exceptional singer, was nominated for a Grammy award, and was a member of an ensemble that won a Grammy. *Cf. Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) ("Given plaintiff Celle's own characterization of himself as a 'well known radio commentator' within the Metropolitan Filipino–American community, the district court correctly held that he is a public figure."). In addition, Phares's deposition, on which Lane also relied, is some evidence that Lane used her stature as a world-recognized opera singer to recruit students to her studio and that students at UNT and students at other schools had heard of Lane. The record further shows that Lane is recognized nationally and internationally for her singing. Lane's singing performances have been discussed in media stories in newspapers across the country. In fact, a recording of one of Lane's performances, filmed for television, is used as a teaching tool in universities across the country. And, Lane intertwines her renown in the opera world with her teaching credentials, using her successes in her singing career to boost her voice teacher credentials on her faculty page and discussing her teaching successes on her professional website, promoting herself on the site as a teacher who leads her students to success in the opera world.

13

*Third*, the statements Lane sued Phares for making, discussed more below under Lane's second issue, all concerned Lane's role as a voice teacher.

Despite this undisputed evidence of Lane's notoriety in her profession, Lane directs our attention to this court's decision in *Hoskins* and argues that the facts in this case "closely align with the facts in *Hoskins*," where we held that the plaintiff, a university professor, was not a public figure. *See Hoskins*, S.W.3d at 843. However, even a cursory review of that case reveals that the facts of this case are quite unlike the facts of *Hoskins*. Unlike here, the record in that case established *only* that the plaintiff was a tenured university professor. *Id.* Based on that fact, we held that the evidence was insufficient to show that the plaintiff was a public official, a general-purpose public figure, or a limited-purpose public figure. *Id.*

Oddly, Lane then argues that it was the trial court's fault for making her a public figure by "inappropriately punish[ing] Professor Lane for promoting her career," "as revealed by the [trial court's] repeated references to Professor Lane's professional websites." This argument is without merit. As Abraham Lincoln observed, "[w]hat kills a skunk is the publicity it gives itself." GREAT QUOTES FROM GREAT LEADERS 21 (compiled by Peggy Anderson, 1990). Lane's career is what it is without any assistance from the trial court. Lane simply cannot sing her national and international renown on her website and the UNT faculty page, stand by those statements in her affidavit, and then claim she has no public presence. The trial court's recognition of Lane's accomplishments as

14

set out on her websites and her affidavit was not "punishment" for her self-promotion—it was an acceptance of the evidence before it.

We hold that Lane is, at the least, a limited-purpose public figure. We therefore overrule Lane's first issue.

### V. Lane Did Not Establish Actual Malice

#### A. Actual Malice in Defamation Claims

As a public figure, to maintain her claim Lane had to produce evidence that Phares published a defamatory statement about her with actual malice. *See Hearst Corp. v. Skeen*, 159 S.W.3d 633, 636–37 (Tex. 2005). "Actual malice" in the defamation context does not mean injurious motive or ill will toward the plaintiff, but rather means that the defendant had knowledge of the falsity of the statement or reckless disregard for the truth. *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016). The focus therefore "is on the defendant's attitude toward the truth, not [her] attitude toward the plaintiff." *Id*; *see also New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 162 (Tex. 2004) ("Constitutional malice generally consists of (c)alculated falsehood." (citations and quotation marks omitted)). "Reckless disregard is a subjective standard, focusing on the defendant's state of mind." *New Times*, 146 S.W.3d at 162. To establish reckless disregard, the plaintiff "must establish that the defendant in fact entertained serious doubts as to the truth of [her] publication, or had a high degree of awareness of . . . (the) probable falsity of the published information." *Id.* (citations and quotation marks omitted); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485,

511 n.30, 104 S. Ct. 1949, 1965 n.30 (1984) ("The burden of proving 'actual malice' requires the plaintiff to demonstrate . . . that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement."). "[T]he actual malice standard focuses on the defendant's state of mind at the time of publication not after the defendant was sued." *Cruz v. Van Sickle*, 452 S.W.3d 503, 517 (Tex. App.—Dallas 2014, pet. struck).

"Although the failure to investigate does not, on its own, demonstrate actual malice, a purposeful avoidance of the truth does." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 578–79 (Tex. App.—Austin 2007, pet. denied); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692, 109 S. Ct. 2678, 2698 (1989) ("[F]ailure to investigate will not alone support a finding of actual malice"); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 313 (5th Cir. 1995) ("Negligence, lack of investigation, or failure to act as a reasonably prudent person are insufficient to show actual malice."). "An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice." *Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002). Further, while a lack of care or a bad motive is not proof of actual malice, "care and motive are factors to be considered." *Id.*

16

**B.      Lane Failed to Make a Prima Facie Showing of Phares's Actual Malice**

Lane argues that she produced prima facie evidence of Phares's actual malice because: (1) Phares attested that her comments were based on gossip from anonymous individuals, rendering her comments "'inherently improbable assertions' that were 'obviously dubious'"; (2) Phares failed to investigate the truth of the rumors she heard before republishing them as fact; and (3) Phares's comments were not based on personal experience.

We discuss below the basis of Phares's belief in each of the statements she made. However, we must first address Lane's assertion in her brief that she had prima facie evidence of actual malice because "Phares testified that her normal habit was to only make statements that concerned her personal experience[,]" but "in this case, none of the defamatory statements concern her personal experience." To support this assertion, Lane cited to a part of Phares's deposition in which Phares talked about ensuring that her complaints were based on her personal experience. Lane, however, "cherry-picks" and misrepresents the context of that testimony. A closer look at the deposition transcript shows Phares was responding to a question asking specifically about statements she made in a letter to the chair of the UNT voice department in which she complained about Lane's teaching. When asked what care she exercised to make sure her statements *in that specific letter* were correct, she replied that she "reread and made sure it was all based on [her] personal experience" and that she reviewed recordings of her voice lessons and a voice journal she kept with

notes from her lessons. Phares's response to the question did not address the basis of Phares's belief for all of the statements she posted online and for which Lane has sued her.

## 1. Phares's statements that Lane filed lawsuits against every school that employed her, including UNT

The first statements for which Lane contends she had evidence of actual malice was Phares's statements that Lane filed lawsuits against each of her university employers. Lane stated in her affidavit that she has never filed a lawsuit against a university. As for Phares's knowledge or belief about the truth of her statements, Lane asserted that she met her burden to show actual malice because Phares's TCPA motion "establishes that she knew that she could not know whether her statements were true or not because she is not an attorney." Lane's argument references a contention Phares made in her TCPA motion that her online comments were statements of opinion. *See Vice v. Kasprzak*, 318 S.W.3d 1, 18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("The analysis for distinguishing between an actionable statement of fact and a constitutionally protected expression of opinion focuses on the statement's verifiability and the entire context in which it was made."). In arguing that her comments were statements of opinion because they were not objectively verifiable, Phares asserted that while an attorney with access to the filings of each county of each school that had employed Lane could possibly verify the accuracy of the statements, such an undertaking would not be easily done, much

18

less by a lay person. That section of Phares's motion to dismiss did not negate her belief in the truthfulness of the statements. Elsewhere in her motion, she argued that the statements she made were true, and she addressed the basis for her belief.

Further, Phares's affidavit and deposition testimony, both of which Lane included with her response to Phares's TCPA motion, showed the basis for Phares's belief. In Phares's affidavit, she explained that she began to hear rumors about Lane while auditioning for schools and on the audition circuit for companies and programs. During those auditions, students commonly sat and talked in the hallways before their auditions, and conversation would turn to who studied with whom. According to Phares's affidavit, "[n]umerous, non-UNT students on the audition circuits had stated that Lane had caused problems at her former schools and threatened lawsuits, filed lawsuits, and was known for trying to settle things out of court and under the rug." At first, Phares dismissed the talk as mere gossip, but she "became convinced it was the truth when more and more students recounted the same story at various auditions." She "further ran across a lawsuit online while searching for Lane's name, which [she] believed fit the description of one story [she] had heard, but was unable to verify it as the case had been settled." Then, while she was a student at UNT, multiple students told Phares that Lane had filed a complaint against another voice teacher. And during her lessons with Lane, Lane would make statements against UNT and

19

students, and Lane told Phares "that she took gossip very seriously and would not hesitate to involve the legal system."

In her deposition, Lane's attorney asked Phares to elaborate on the statements in her affidavit. Phares testified that she first heard the rumors about Lane while auditioning at the University of Kentucky, a school where Lane had once taught. People made similar statements about Lane's litigious reputation at other auditions, and Phares continued to hear such rumors about Lane after she started at UNT. Multiple UNT students told Phares that Lane had filed a complaint against a specific UNT professor; other students said she had filed or was planning to file a lawsuit against the professor. At her deposition, Phares provided the names of some of the UNT students who were present for the conversations, but she could not remember which student said what. At an audition for a program in Austin, another auditioning student asked Phares if it was true that Lane had filed a lawsuit against every school she had ever worked for.

Lane's attorney asked Phares if she had ever asked Lane about the rumors. Phares responded that she had not because she did not feel comfortable asking Lane questions due to the atmosphere Lane created. Phares testified that she "didn't feel as though questions were encouraged during [her] lessons and sometimes questions were not allowed," and Phares "was pretty intimidated" by Lane. Phares also stated that there "were a few times in [the] lesson where [Phares] was asking for a pedagogical clarification and [she] was

20

not allowed to finish the question and told [by Lane] something like, [']that's an undergraduate question['] or [']don't question me.[']" Phares stated that the lessons with Lane developed an environment "to where [she] didn't feel comfortable talking about things that were a little uncomfortable to talk about." This testimony mirrored the complaint that Phares made to the chair of the UNT voice department, in which she stated that she was "uneasy and often nervous around Lane," that she dreaded her lessons and had trouble sleeping the night before and after, that "Lane often shut[] [her] down when [she] attempt[ed] to explain things," and that Phares had "tried to disagree or discuss things with Lane and ha[d] been shut down and not acknowledged."

Asked at her deposition if she believed at the time she posted online the alleged defamatory statements that Lane had filed lawsuits against the University of Kentucky, Stanford University, and UNT, Phares responded that it was gossip she had heard "a lot," and she did believe it. When asked what she did to verify the accuracy of her statements about Lane filing lawsuits, Phares answered that her statement "was based on things I heard from others at various points and the repetition and so I started to believe it was true." Then, after finding information online about a lawsuit involving a Jennifer Lane, "when [she] put all that together, [she] just believed it was true." Phares found a case summary online of a 1997 suit that named the plaintiff, defendant, and the nature of the case. The defendant in the suit was not a university, but because the plaintiff's name was Jennifer Lane and the suit involved defamation—and some of the people telling

21

Phares the lawsuit rumors had mentioned defamation—Phares believed at the time that the 1997 suit had been filed by her voice teacher, Lane.

Finally, upon deposition questioning from her own lawyer, Phares acknowledged that it was possible that people talking about Lane's filings against her employers had used the word "complaints" and that Phares had misinterpreted the word "complaint" to mean a legal action, meaning that the people speaking could have meant that Lane had filed internal complaints at the universities where she worked.

In sum, Lane's evidence of actual malice included Phares's testimony that she was repeatedly told by other students about Lane filing complaints or lawsuits against each of her university employers. Lane's behavior and demeanor in her lessons intimidated Phares and deterred her from asking Lane about the rumors directly, but Phares testified that Lane herself told Phares she would not hesitate to take legal action to defend herself against gossip. Phares attempted to find confirmation online using resources available to a lay person, and she found a lawsuit that she believed, albeit mistakenly, supported what she had come to believe. This evidence does not indicate that Phares purposefully avoided learning the truth. *See Bentley*, 94 S.W.3d at 596 ("A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is."). From this evidence, Lane did not make a prima facie showing that when Phares published the statements about Lane filing lawsuits and complaints, she knew the statements were false, had serious doubts as to their truth, or had

22

a high degree of awareness of their probable falsity. *See New Times*, 146 S.W.3d at 162; *Cruz*, 452 S.W.3d at 517.

## 2. Phares's statement that Lane loses an average of three to four students per semester

Lane contends that she satisfied her prima facie burden to show that Phares acted with actual malice in posting on the internet that Lane loses an average of three to four students per semester because Phares testified in her deposition that she never asked Lane about the truth of the statement. According to Lane, "Phares testified that she had personal knowledge of the students who left Professor Lane's studio, and so she should have known that only one student left Professor Lane's studio in the Fall of 2014 and three students (including Phares) left Professor Lane's studio in Spring 2015."

Lane again misconstrues Phares's testimony. Phares testified in her deposition that she still believed that her statement was true at the time that she made it based on her personal experience. She named two students she believed left in the fall 2014, and seven students, including herself, she believed left in the spring 2015, although she stated that because the students left at the end of the semester, one or two of those students may not have officially withdrawn until fall 2015. Phares stated that she based her knowledge of these students leaving on seeing students who used to be in Lane's studio with her begin going to performance rooms of voice teachers other than Lane and seeing different teachers listed for them in performance programs. She also had

conversations with most of those students about leaving Lane's studio. Phares even described her conversation with the students. In those conversations, the students talked about leaving, trying to obtain approval to leave Lane's studio, or starting the process to leave, and the various steps they were taking or thought they should take to get official approval to withdraw. Phares testified that she trusted the students she spoke with to tell her the truth. Given this evidence, we cannot say that Lane established a prima facie case that Phares knew the statement was false or that she showed a reckless disregard for the truth. *See New Times*, 146 S.W.3d at 162.

### 3. Phares's statement that Lane teaches in unhealthy ways and causes vocal problems and injuries

Lane argues that she met her burden to show actual malice regarding Phares's internet postings about Lane teaching in unhealthy ways and causing vocal problems because Phares had no personal experience with Lane causing a documented vocal injury.

In Lane's affidavit, she stated, without elaboration, that she does not teach in unhealthy ways and has never caused a student vocal problems or vocal injuries. As for evidence about Phares's knowledge of the truth of her statements, we agree with Lane that in Phares's deposition testimony describing her experience in Lane's studio, she admitted that none of the techniques Lane had her perform in lessons caused her actual injury. However, Phares further explained that she did experience vocal *problems*, which, to her, was a different

24

issue than vocal *injury*. When she wrote of Lane causing vocal injury, she was referring to the experience of another student. She then provided the basis for her online comments.

Regarding vocal problems, Phares testified that "you shouldn't leave your lessons feeling vocally tired or hoarse at all, and I would leave my lessons feeling that way." At the time of her deposition, she acknowledged that in retrospect, it was possible that in her lessons, she incorrectly performed the techniques Lane was teaching her. But despite having less certainty than she previously had that Lane had caused her problems, she still believed that Lane taught in unhealthy ways that caused vocal problems. That she later questioned her previous belief does not show that *at the time she made the statement*, she knew it was false or that she had a reckless disregard for the truth. *See New Times*, 146 S.W.3d at 162.

As for her statements that Lane had caused a student documented vocal injury, Phares explained that while Lane did not cause *her* vocal injury, when she posted the comments online, she believed that Lane had caused another student vocal injury. She first heard the allegation from another auditioning student while she was auditioning at the University of Kentucky. The student's comment concerned Phares, but she tried to "tune it out."

Once at UNT, Phares heard about the issue from Lane herself. Early in Phares's first semester as Lane's student, Lane told Phares that another student, Fabiana, blamed Lane for her vocal injury. Lane said "that that was a big issue,"

25

and "[s]he mentioned that other students say things about her methods of teaching that aren't true." Lane told Phares that "there was an air of gossip and that a lot of it . . . wasn't true and it was based on students not liking her." When Phares came to her lesson from another class, Lane asked her "if anyone in that class said anything about her that day and mentioned to stay away from students in [another teacher's] studio."

Phares talked to Fabiana, who said that "there was an issue" and did not elaborate. Phares had a conversation with a fellow student of Lane's named Barrett, who told her that Fabiana had told him that Lane had caused Fabiana a vocal injury. Barrett indicated Fabiana's injury "was caused by what was going on in lessons and techniques and various things," though at the time of her deposition, Phares could not remember the exact details of that conversation. Phares stated that she believed Barrett, who she knew was "very good friends with Fabiana." Because she believed Barrett, she believed her statement that Lane had caused a student a documented vocal injury was true when she made it.

While still Lane's student, Phares wrote two emails that were complimentary of Lane that she submitted to the chair of the voice department, and Lane included one of these letters with her response to Phares's TCPA motion. The letter a September 2014 email, was written soon after Phares began studying with Lane. She stated in the email that she was "happy to be surrounded by professionals who recognize vocal issues early on and see that

excellent treatment is provided as quick as possible," and she thanked the chair for "providing and maintaining such a supportive and healthy environment for your musicians." She stated that faculty members at a program she had recently participated in were "excited that [she is] with a teacher here who won't push [her] into singing the Ring Cycle before [she is] ready, and a Music Department that supports ideal healthy singing practices."

The September 2014 email, written soon after Phares began studying with Lane, does not show that Phares knew her statements about Lane causing vocal damage and vocal injury were untrue at the time she made them. In a letter Phares submitted to the chair of the voice department in February 2016, which Lane included with her response to Phares's motion, Phares explained that she had written the September 2014 email at Lane's request and that Lane told her what the letter should say and had Phares email her the rough draft. She explained at her deposition that at the time she wrote the email, she believed she "was involved in healthy singing practices" and believed what she wrote at Lane's direction was true. But later, from her own experience and from talking to Barrett, she came to believe otherwise.

While Phares testified that Lane told her that the students talking about her made untrue accusations, Phares's description of the context of Lane's statements suggested a preoccupation on Lane's part with possible negative statements students and faculty might be making about her. In that context as described by Phares, Lane's statements about Fabiana's accusation do not look

27

like evidence that Phares knew her statement was false when she made it, but like Phares's opinion that Lane had tried to manage Phares's opinion of her. Further, Phares testified that Barrett, Fabiana's close friend, gave her information about the cause of Fabiana's injury, and she believed him. Considering all this evidence together, Lane failed to make a prima facie showing that when Phares made the statements about Lane's teaching methods, she knew they were false or that she showed a reckless disregard for the truth. *See New Times*, 146 S.W.3d at 162.

### 4. Phares's statement that Lane disparages UNT singers and faculty

According to Lane, she met her burden to show actual malice regarding Phares's internet postings that Lane disparages UNT singers and faculty because Phares had no personal experience of Lane disparaging UNT singers and faculty. But Phares testified in her deposition that the basis for this statement was "personal experience and the different things [Lane] had said to [Phares] during lessons about others." Phares even gave several examples of what she considered to be Lane disparaging UNT singers and faculty. She described Lane telling Phares, regarding a student who had been given a particular role in a production, that the student "had no business singing that role and [that Lane] wasn't sure why she was cast that way." Lane "told [Phares] that a lot of faculty said things about her that were untrue, and would ask me what they said," and she told Phares that faculty members "were very unprofessional in regards to [Lane]." Phares also testified that Lane asked her if another

28

teacher, Carol Wilson, had been trying to recruit Phares to Wilson's studio, and told Phares "to be very careful and asked [Phares] to remove Carol Wilson from . . . [her] orals committee." Lane told Phares not to take any issues to the chair of the vocal department because "he's part of the problem." While Lane might disagree that these alleged statements rise to the level of "serious" disparagement, Phares's deposition is evidence of Phares's belief in the truth of her statement, formed from her personal experience, and a lack of actual malice on her part.

Further, in the complaint Phares gave to the chair of the vocal department regarding Lane, which Lane included with her response to the motion to dismiss, Phares stated that "Lane has mentioned specific likes/dislikes about other students to me (Kong, Claire, undergrads)," "Lane talks about other students in her studio to me," and "Lane becomes suspicious when I befriend people outside of her studio."

Lane's affidavit was the only evidence Lane presented to make a prima facie showing that Phares had no personal experience of Lane disparaging UNT singers and faculty and to counter Phares's deposition testimony and the statements in her complaint. In Lane's affidavit, she addressed Phares's online comments on the matter in a single conclusory statement: "I do not disparage UNT singers and faculty members in a serious way." She did not elaborate and did not address or dispute the allegations Phares made in her deposition testimony or in her written complaint. The evidence did not make a prima facie

29

showing that Phares knew her online comment about Lane disparaging others was untrue or that she made the comment with reckless disregard to its truth. *Cf. Dolcefino v. Randolph*, 19 S.W.3d 906, 930 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("Conclusory statements in affidavits are not proper as summary judgment proof if there are no facts to support the conclusions."). Lane therefore did not make a prima facie showing of actual malice with respect to this statement.

**5.    Phares's statement that Lane is distracted and not focused during lessons and is often on computers and cell phone while a student is singing in Lane's studio sessions**

Regarding her posted comment that Lane is distracted and not focused during lessons and is often on computers and her cell phone, Phares acknowledged that her comment was based on her own personal experience. She testified in her deposition that she based her comment on "situations [she] recalled and also verified in [her] voice lesson recordings and [her] voice lesson journal." Lane would look at her phone or computer during the lesson, sometimes while Phares was singing. Asked if Lane "was maybe just keeping time on her timer on her phone," Phares responded, "I couldn't pinpoint every single time, but—for example, one time she had to answer the phone and it was something not related to a lesson." Lane took the call while Phares was singing. In her affidavit, Phares stated that "during many of my voice lessons with Lane, Lane was looking at her phone or computer and seemed distracted and unfocused."

Lane stated in her affidavit that she is "not often on computers or cellular devices while one of my students is singing in my studio sessions." (She did not address or deny the part of Phares's comment contending that Lane was distracted and not focused during lessons.) However, Lane's affidavit is not prima facie evidence about *Phares's belief* about the truth of her statement. Lane's single, conclusory statement does not deny that she was sometimes on her computer or cell phone during lessons. She does not address Phares's statement that during one of her lessons, Lane took a phone call unrelated to the lesson. Lane's affidavit states simply that she was not *often* on the phone or computer during lessons. Lane's affidavit contains no facts supporting or explaining the statement and does nothing to challenge the basis of Phares's belief that the behavior Phares complained of not only happened, but happened often. Lane therefore did not establish that Phares made the comment with actual malice.

### 6. Phares's statement that Lane has been on faculty probation

Finally, Lane challenges Phares's posted statement that Lane has been on faculty probation by countering with her affidavit testimony that "I have never been on faculty probation." This is not evidence of *Phares's knowledge* of its truthfulness. *See Bose Corp.*, 466 U.S. at 511, 104 S. Ct. at 1965 ("[T]here is a significant difference between proof of actual malice and mere proof of falsity.").

Phares's affidavit and deposition, on the other hand, explain the basis of her belief for the comment. In Phares's affidavit, she stated that her "belief and

understanding is that Lane did not teach voice lessons because she was not allowed to teach voice lessons prior to 2014." While Phares did not know UNT's reason for not allowing Lane to teach voice lessons, she knew that Lane "was teaching other classes and was not on sabbatical." Phares did not have access to UNT records and could not verify if Lane had been on probation, but "the impression [Phares] was left with was that she had been."

In her deposition, Phares explained that UNT's website lists what courses professors have taught or are teaching, and when Phares looked at the website, Lane was listed as having taught voice lesson and voice studio in previous years, but not for the year immediately before Phares started at UNT. Phares believed that Lane was not on sabbatical, however, because she taught other classes that year. Phares testified, "when a voice professor doesn't teach studio voice, it just made me wonder why and wonder if there was a bigger reason." Phares spoke to another student, Julianna, about the issue, and Julianna told Phares that Lane had not been allowed to teach voice that year because of "some issues." Phares could not remember if Julianna had expanded on what those "issues" were. Based on Lane being a voice professor yet not teaching voice classes and on Julianna's statement that Lane had not been allowed to teach voice that year, Phares believed at the time she made her comment that Lane had been on probation for that year. Phares discussed her belief with another student, Farah, who agreed it "didn't look good" that Lane, a voice professor, had not taught voice the previous year. As of the time of the deposition, Phares did not know if

32

"probation" was the "official," correct term, but she still believed that whatever the proper term for what happened, it was "something" that meant Lane had not been allowed to teach that year.

A document listing classes Lane taught from 2011 to 2015, which Lane included as evidence with her response to Phares's motion to dismiss, showed that Lane taught only voice classes in 2011, 2012, and spring of 2015. She taught both voice and "graduate diction" in fall 2014, but she did not teach voice in 2013. Instead, for the academic year from fall 2013 to spring 2014, she taught "advanced vocal diction" and "vocal literature."

None of the record evidence makes a prima facie showing that Phares made her online comment about Lane being on faculty probation with knowledge that the comment was untrue or with reckless disregard for the truth.

Because Lane did not make a prima facie showing of actual malice for the challenged statements, we overrule her second issue.

## VI. Conclusion

Having overruled Lane's two issues, we affirm the trial court's order dismissing Lane's claims against Phares under the TCPA.

33

                                                    /s/ Mark T. Pittman
                                                    MARK T. PITTMAN
                                                    JUSTICE

PANEL:  SUDDERTH, C.J.; MEIER and PITTMAN, JJ.

DELIVERED:  February 15, 2018