

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

───────────────────────

No. 02-18-00126-CV

───────────────────────

JAN MOGGED, JAMES RICHARD FLETCHER, AND MICHAEL ALAN TAYLOR, Appellants and Cross-Appellees

V.

BOBBY WAYNE LINDAMOOD JR. AND JR'S DEMOLITION & EXCAVATION, INC., Appellees and Cross-Appellants

───────────────────────────────────────────

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-278342-15

───────────────────────────────────────────

Before Meier, Kerr, JJ.; and Quinn, C.J. (Sitting by Assignment)
Memorandum Opinion by Chief Justice Quinn
Concurring Memorandum Opinion by Justice Meier
Dissenting and Concurring Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

This appeal involves 1) the propriety of dismissing a defamation suit under section 27.003 of the Texas Civil Practice and Remedies Code, *see* Tex. Civ. Prac. & Rem. Code Ann. § 27.003 (West 2015); 2) a claim that the trial court neither awarded enough attorney's fees nor levied enough sanctions; and 3) a complaint about the trial court's purported failure to issue findings of fact and conclusions of law. We affirm in part and reverse in part.

## Background

In a nutshell, Bobby Wayne Lindamood Jr. and JR's Demolition & Excavation, Inc. sued various individuals, including Jan Mogged, James Richard Fletcher, and Michael Alan Taylor, alleging multiple causes of action against the defendants, including defamation. The dispute spawned from a city-council election wherein Lindamood and Taylor were competing candidates. Needless to say, Taylor's campaign literature contained statements about Lindamood that Lindamood believed were defamatory and purportedly injured his business (i.e., JR's Demolition). So, Lindamood and JR's Demolition sued those they thought were responsible. Except for Taylor, Mogged, and Fletcher, the defendants were nonsuited or otherwise dismissed from the action.

Taylor, Mogged, and Fletcher eventually invoked what euphemistically has become known as the anti-SLAPP statute and moved the trial court to dismiss the suit. The trial court did so. They then asked for attorney's fees, sanctions, and costs;

the trial court again acceded, levying a $1,000 sanction and awarding attorney's fees of $30,296.09 for the services of "Alfonso Garcia Chan and the law firm of Shore Chan DePumpo LLP"; $4,404.06 for the services of "Bradley C. Poulos and the law firm of Cantey Hanger LLP"; and $3,490 for the services of John Brender. Both sides appealed.

### Dismissal of Suit

We begin our effort by first addressing Lindamood's appeal. If meritorious, it would dispense with the need to address the complaints urged by Taylor, Mogged, and Fletcher in their appeal. Lindamood asserts that the trial court erred in dismissing his defamation-based claims.[1] It dismissed the claims under the auspices of section 27.005 of the Texas Civil Practice and Remedies Code. It provides that "on the motion of a party . . . a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." *Id.* § 27.005(b) (West 2015). Dismissal may not occur "if the party bringing the legal action [i.e., the nonmovant] establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Lindamood contends that

---

[1]Though other causes of action were also dismissed, Lindamood failed to complain about their dismissal. Thus, we do not address the propriety of their disposition by the trial court.

he "established a prima facie case of their defamation per se claims." We agree in part as to Lindamood but not JR's Demolition.

The applicable standard of review is de novo. *United Food & Commercial Workers Int'l Union v. Wal-Mart Stores, Inc.*, 430 S.W.3d 508, 511 (Tex. App.—Fort Worth 2014, no pet.). Applying it here is akin to a swinging pendulum. We begin by determining whether the party moving for dismissal satisfied the burden imposed on it under section 27.005(b). *Greer v. Abraham*, 489 S.W.3d 440, 443 (Tex. 2016); *United Food*, 430 S.W.3d at 511. If so, then the pendulum swings to the nonmovant and obligates us to see if he established by clear and specific evidence a prima facie case for each essential element of the claim in question. *Greer*, 489 S.W.3d at 443. If so, then the pendulum swings back to the movant, and we determine if he established by a preponderance of the evidence any available defense to the suit. *United Food*, 430 S.W.3d at 511. The tether on which the pendulum swings back and forth is comprised of the pleadings and affidavits filed by the parties. *Id.* at 511–12 (stating that "[i]n reviewing the trial court's determination of whether a legal action should be dismissed . . . we consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based").

The clear and specific evidence mentioned in section 27.005(c) may be direct or circumstantial. *Van Der Linden v. Khan*, 535 S.W.3d 179, 188 (Tex. App.—Fort Worth 2017, pet. denied). Though the standard described by section 27.005(c) does not impose a heightened evidentiary burden, *Hand v. Hughey*, No. 02-15-00239-CV,

4

2016 WL 1470188, at *4 (Tex. App.—Fort Worth Apr. 14, 2016, no pet.) (mem. op.), the evidence nonetheless must be clear and specific. *Schofield v. Gerda*, No. 02-15-00326-CV, 2017 WL 2180708, at *10 (Tex. App.—Fort Worth May 18, 2017, no pet.) (mem. op.). It should establish the when, where, and what was said to be enough to survive a motion to dismiss under the anti-SLAPP statute. *Id.*

Next, concerning the nonmovant's clear and specific evidence of his prima facie case, we note that the burden is satisfied when there exists record evidence that supports a rational inference that the allegations of fact are true. *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding). In other words, the record must contain clear and specific evidence to support a rational inference that each element of the cause of action has a factual basis. Doing that entails our construing the evidence in a light most favorable to the nonmovant. *E. Tex. Med. Ctr. Athens v. Hernandez*, No. 12-17-00333-CV, 2018 WL 2440508, at *2 (Tex. App.—Tyler May 31, 2018, pet. denied) (mem. op.); *Warner Bros. Ent'mt, Inc. v. Jones*, 538 S.W.3d 781, 800–01 (Tex. App.—Austin 2017, pet. pending); *Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017, no pet.). With this in mind, we turn to the record before us.

No one questions whether the conduct underlying Lindamood's suit implicates the exercise of the constitutional rights to speech, association, and petition. Indeed, the conduct at issue encompasses the dissemination of written information about one of two candidates in a political race; the candidate in question happened to be

5

Lindamood. Furthermore, the legislature has defined an exercise of free speech as a communication made in connection with a matter of public concern. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3) (West 2015). No doubt, an election is a matter of public concern, as are the qualifications and character of those seeking the public office. Given this, we conclude that the initial swing of the pendulum shows that Taylor, Mogged, and Fletcher met their evidentiary burden. There is a preponderance of the evidence that the legal action is based on, relates to, or is in response to a party's exercise of the right of free speech. The pendulum now swings in the direction of Lindamood and JR's Demolition to see if they established a prima facie case on each element of their defamation claims through clear and specific evidence.

The elements of defamation include 1) the publication of a false statement of fact by the defendant, 2) that defamed the plaintiff, 3) with the requisite degree of fault concerning the truth of the statement, and 4) damages, unless the statement constitutes defamation per se. *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017); *Ghrist v. MBH Real Estate LLC*, No. 02-17-00411-CV, 2018 WL 3060331, at *4 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op.). Publication with actual malice also plays a role when the object of the purported slander is a public official or seeks public office. *Greer*, 489 S.W.3d at 443; *see Hand*, 2016 WL 1470188, at *6 (requiring actual malice regarding defamatory statements made during a justice of the peace election). Actual malice arises when the defamatory statement is knowingly false or conveyed with reckless disregard for its truth. *Hand*, 2016 WL 1470188, at *6.

6

The purported defamation here appears in three forms. One is a document we call "the Excerpt" and which was composed by Taylor. Another is a document entitled "Colleyville Voters Alert" (Alert) which Taylor, Mogged, and Fletcher allegedly published. The last is Fletcher's statement in an internet discussion forum (Forum).

### The Excerpt

Regarding the Excerpt, it consisted of highlighted excerpts from a deposition. That is, Taylor received Lindamood's deposition that was taken as part of some distinct probate dispute between Lindamood and his stepmother. Legal counsel for the stepmother sent the document to Taylor as a digital attachment to an email. Taylor read the deposition, culled seven pages from it, underlined certain passages within the culled pages, and redacted the name of Lindamood's stepsister from it. Taylor then revealed the Excerpt to his campaign workers. Taylor believed the Excerpt contained information about "legitimate issues that an informed voter would be concerned about in regard to . . . Lindamood's character" and told his campaign workers as much. Despite his belief, his expenditure of time in reading the deposition, his culling pages from and taking time to highlight passages in it, and his telling others how the culled testimony could influence voters, he and the group purportedly agreed that "we could not use the sworn testimony in any way."

Lindamood contended that the Excerpt itself contained defamatory statements about him. His argument was founded upon the notion that underscores highlighting

7

certain words in a deposition can be defamatory. Yet, as we previously mentioned, the first element of defamation requires the publication of a false "statement of fact." *Ghrist*, 2018 WL 3060331, at *4; *accord Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018) (stating that the threshold requirement of defamation is the publication of a false "statement of fact" to a third-party). We are not prepared to say that the mere underscoring of either questions propounded in or answers uttered during a deposition constitute a statement of fact. Doing so merely draws attention to what was underscored; drawing attention to the words alone is not a statement of fact. Indeed, if we were to conclude otherwise, then we would be left with the rather interesting task of deciding 1) what in the mark makes the mark false and defamatory or 2) how an otherwise true statement being highlighted is rendered false by the highlight. In short, the Except did not defame Lindamood because Taylor deigned to highlight passages within it. Nor were the passages themselves rendered false and therefore defamatory merely because they were highlighted.[2]

### The Alert

The Excerpt supplied the foundation for the Alert. The latter was made by taking the Excerpt and adding typed commentary in red within its margins and on its face. Because the Alert was founded on the Excerpt, the redactions made by Taylor

---

[2]Lindamood did not argue that the passages which were highlighted were themselves false.

8

remained in the Excerpt were found in the Alert. Many but not all of the same passages that Taylor underlined in the Excerpt were also underlined in the Alert.

Beneath the title of the Alert there appeared in red the admonishment "Read Before Voting." Following the admonishment were the phrases "Bad behavior!"; "Bad judgment!"; and "Bad for Colleyville." Also printed in red at the bottom of the first page was the following:

> Attached are pages 37-42 of the sworn testimony given by Bobby Lindamood, Jr. on March 4, 2011. This is the same Bobby Lindamood, Jr. running for Colleyville City Council. The answers to the questions are his words unaltered and the deposition was provided by a representative of one of the parties to the deposition.

On the left margin of the Alert appeared multiple representations (in red) purporting to summarize various events involving Lindamood and females. The author wrote, among other things, statements like: 1) "[a]s the attorney drilled down on Bobby, suddenly Bobby began to blame the underage victim and others for his bad behavior"; 2) "[t]he most egregious bad act took place in his house where his father, his wife and an underage victim were staying"; 3) "[t]he name redacted is an underage family member that chose not to be identified"; 4) "[d]id 'it' stop because Bobby's Dad walked in while Bobby was sexually assaulting a drunk minor?"; 5) "Bobby went to bed with his wife . . . got out of bed, went down the long hall and crawled onto the couch with the minor and began to fondle her"; 6) "Bobby then blamed the underage victim for what he, a grown married man, did"; 7) "Bobby admitted to circulating pictures of his penis, sex with a prostitute and sexually assaulting a drunk minor";

9

8) "[f]inally he admitted to all these bad acts while married"; 9) "Bobby finally described details and ultimately confessed that all the bad acts happened"; and 10) "[i]t ended when she stopped him and pushed him away. Here the minor accused Bobby of sexually assaulting her."

### Defamatory Falsehood

From comparing the comments with the actual verbiage in the deposition, one can readily infer that the writer purported to be summarizing the deposition contents for the reader. Often though, the substance of what actually was asked of and answered by Lindamood did not support the adjoining comment or summary. For instance, Lindamood did not admit to having sex with a prostitute. Nor did he admit to circulating pictures of his penis. Instead, he was asked if his father was upset with him "when you circulated photographs of your penis around Lindamood Demolition Company; isn't that true?" His reply was: "That's incorrect. I don't know what you're talking about."[3]

_____

[3]One could characterize this as a "have you stopped hitting your wife" type question. As asked, the inquirer effectively insinuates the verity of a fact that may not be a fact—that the responder hits his wife. If the responder does not and never did strike his wife, he must use utmost caution in selecting his words when answering. Simply answering "yes" or "no" would discredit him. Here, in asking Lindamood whether his father grew angry when he purportedly circulated pictures of his penis, the attorney insinuated that Lindamood actually circulated such pictures when that may not have occurred. Lindamood's response may be interpreted as either a denial of the occurrence or as a denial that his father grew angry.

As for the incident concerning the purported fondling of a drunk minor, he acknowledged having touched the breasts and thigh of his stepsister, who was drunk at the time. She was not a minor, and more importantly, nothing in either the Excerpt or the Alert suggested that she was. Instead, the writer simply fabricated the characterization. Moreover, Lindamood did not admit to sexually assaulting a minor, which act would constitute a criminal offense. *See* Tex. Penal Code Ann. § 22.011(a)(2) (West Supp. 2018) (defining the crime of sexual assault involving a minor). That too was a fabrication.

As previously mentioned, the causes of action pursued by Lindamood required a false statement that was defamatory. *Hoskins v. Fuchs*, 517 S.W.3d 834, 840 (Tex. App.—Fort Worth 2016, pet. denied) (describing the elements of defamation). To be defamatory, the falsehood should be derogatory, degrading, somewhat shocking, and contain elements of disgrace. *Id.* It should tend to injure the plaintiff's reputation, thereby exposing him to hatred, contempt, ridicule or financial injury or tend to impeach the person's honesty, integrity, or virtue. *Id.* And, whether the publication involved is false and defamatory depends upon a reasonable person's perception of the entire publication. *Id.* That is, the statement is construed "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Id.* (quoting *New Times, Inc. v. Isaaks*, 146 S.W.3d 144, 154 (Tex. 2004)). Additionally, the statement purporting to be false must assert an objectively

11

verifiable fact rather than an opinion, and the context of the statement also plays a role in assessing whether it is a fact or opinion. *Id.*

That Lindamood sexually assaulted a minor falls within the realm of a verifiable fact, rather than opinion. The same is true of the comment informing the reader that he also admitted, in his deposition testimony, to having sex with a prostitute and circulating pictures of his penis. Each comment purports to represent, as a fact, that he admitted to doing those things, and one cannot deny the weight an admission of guilt has in clarifying otherwise vague circumstances. Given this and the context of the Alert, a person of ordinary intelligence could reasonably perceive the statements regarding his admitting to having sex with a prostitute, sexually assaulting a minor, and circulating pictures of his penis as both false and defamatory. Indeed, it would be rather specious to suggest that falsely accusing an adult of admitting he sexually assaulted a child would not expose the adult to public contempt and ridicule. The same is true of the penis and prostitute statements.

Regarding JR's Demolition though, we come to a different end. Lindamood was the subject of the deceitful statements, not his company. Furthermore, the company was not mentioned in the Alert. Under these circumstances, a person of ordinary prudence would not perceive that JR's Demolition was defamed through the document.

*Actual Malice*

In construing the entirety of the record in a light most favorable to Lindamood, we also note the presence of evidence that would enable a person of ordinary prudence to infer that the falsehoods were uttered with actual malice. Actual malice, when used in the context of defamation, does not mean injurious motive or ill will directed at the person being defamed but rather knowledge of the falsity of the statement or a reckless disregard for the truth. *Lane v. Phares*, 544 S.W.3d 881, 891 (Tex. App.—Fort Worth 2018, no pet.); *Hand*, 2016 WL 1470188, at *6. Here, the commentary in red on the first page of the Alert informed the reader that the content of the document consisted of Lindamood's own unaltered words because it was his own sworn testimony. So too did the publisher admonish the intended recipients of the Alert to read it before voting. Various comments in the margins of the Alert also purported to explain and summarize what was 1) being said in the testimony and 2) transpiring between an attorney and Lindamood as he testified under oath. From the publisher summarizing the testimony and explaining what was happening, one could reasonably infer that the publisher 1) read the testimony, 2) knew what was said, 3) knew Lindamood denied sexually assaulting his stepsister, 4) knew that there was never any mention of a minor being involved in any sexual assault, 5) knew that Lindamood did not admit to sexually assaulting a minor, 6) knew that Lindamood did not admit to having sex with a prostitute, 7) knew that

13

Lindamood did not admit to circulating pictures of his penis, and 8) knew that these factual representations to the contrary were false.

We further note that the publisher knew the source of the deposition, as evinced by informing the intended reader that the document came from a "representative of one of the parties to the deposition." Knowing its source, the author could have easily verified the accuracy of certain facts, such as the age of his stepsister. Admittedly, the failure to verify alone is not sufficient to establish actual malice. *Lane*, 544 S.W.3d at 891. Yet care and motive are indicia to consider. *Id.* Foregoing the opportunity to verify the easily verifiable age of Lindamood's stepsister can be reasonably construed as showing a lack of care and motive to ignore the truth, given that it is much worse to entangle Lindamood with a child.

In short, the foregoing litany of circumstances constitutes sufficient evidence from which a rational person could reasonably infer that the author uttered the falsehoods with actual malice. So, Lindamood established a prima facie case on that element of defamation.

### Identity of Publisher

As for the identity of the publisher, there is evidence that Mogged and Fletcher knew of the Excerpt. Other evidence indicates that Mogged mentioned to a third-party an upcoming, unidentified disclosure of a Las Vegas incident, which was

14

discussed in the Excerpt.[4] That comment alone contained nothing derogatory. Nor did it evince the manner in which the disclosure would be made. Yet even assuming that she was alluding to the Alert, that is not evidence tending to support a reasonable inference that Mogged published the Alert or joined with its publisher in creating or disseminating the document. One can know of a rumor without having created it. Similarly, one can know of an upcoming publication without having created it. At best, Mogged's reference to the disclosure of a Las Vegas incident simply means she knew of the upcoming disclosure, not that she unilaterally or in conjunction with others created or intended to publish the Alert.

It is also noteworthy that both the Alert and the Excerpt mentioned the Las Vegas incident. We do not know to which document Mogged referred when she alluded to a disclosure. It may have been either. Because the Excerpt was not defamatory and because it could have been the basis for Mogged's comment, one cannot reasonably infer that mentioning the incident linked her to the Alert. *See Jelinek v. Casas*, 328 S.W.3d 526, 536–37 (Tex. 2010) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005) and stating that where circumstances are equally consistent with either of two facts, neither fact may be inferred).

Lindamood makes much of Mogged's silence when accused of participating in the Alert's publication, and he does so by referring to a passage from a Texas

---

[4]According to the deposition questions, the alleged incident involving Lindamood and the prostitute occurred in Las Vegas.

15

Supreme Court opinion. The passage to which he refers appears in *Miller v. Dyess*,

151 S.W.2d 186 (Tex.), *cert. denied*, 314 U.S. 691 (1941):

> [W]here a ***definite statement of a matter of fact***, affecting a party or his rights, is made in his presence or hearing so that he understands it, and the statement is of such a nature as to call for a reply, the statement, in connection with a total or partial failure to reply, is admissible as tending to show a concession of the truth of the facts stated.

*Id.* at 191 (emphasis added). Furthermore, Lindamood attempts to invoke this rule in

relation to the following attestation contained within David Medlin's affidavit[5]:

> I was simply livid about this defamatory attack against my friend Bobby Lindamood, Jr. after receiving the text pictures of the Alert described above. I was convinced that Michael Taylor, the PAC[6] and his supporters were behind this defamatory publication. I did not get any closer to her than approximately 10 feet away. ***I asked all present*** "Why did you all do this, why did you send this out?" Nancy Coplen said "I don't know anything about it." A shorter lady also sitting at the PAC table said: "I didn't know about it either. We don't know what you are talking about." I then said to the others while looking at Jan Mogged: "Well, ask Jan, she was talking about it at the Newtons' house last Friday afternoon. She knows all about it." I repeated this several times. She (Mogged) looked down in an embarrassed manner and said nothing. Her body language indicated guilt. I then went to the Lindamood election table, retrieved a copy of the Alert from one of the ladies there, returned with a copy of the Alert in hand and held it out in front of Jan Mogged. Jan Mogged stood there in a stunned, sheepish look and never said a word. She hung her head as though she had been caught red-handed.
>
> . . . .

---

[5]Medlin is a Colleyville resident and is active in Colleyville politics.

[6]Lindamood contends in his brief that "PAC" was "a political action committee" known as "Protect Colleyville" which "held regular meetings that were attended from time to time by Taylor, Mogged, and Fletcher, all members."

In her Affidavit, Jan Mogged claims in Paragraph 19 that I showed her the Alert and asked if she did this and she claims she responded "No." This is simply not true; she did not respond "No." She remained silent and never said a word in response *to my question* if she did this. [Emphases added.]

It has been said that silence speaks volumes, but the truth about silence is that no one truly knows what it means. It invites speculation, and our supreme court has recognized that speculation is not evidence. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004) (stating that "Hewett's speculation is not evidence of an attorney-client relationship between Joe and a citizens group and therefore, does not create a fact issue"); *accord Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 833 (Tex. App.—Fort Worth 2008, no pet.) (stating that speculation is not evidence). Indeed, had Medlin expressly opined that he believed Mogged thought she was guilty (as opposed to simply giving his lay opinion as to what her actions meant to him), his opinion would have been speculation beyond the scope of consideration. *Van Der Linden*, 535 S.W.3d at 193 (stating that "a witness's testimony regarding what another person was thinking is inadmissible speculation and should not be considered"). Yet *Miller* seems to invite such speculation. Even so, *Miller* is inapposite.

*Miller* spoke of silence in the face of a "definite statement of a matter of fact . . . of such a nature as to call for a reply." 151 S.W.2d at 191. The interaction described by Medlin has missing a "definite statement of a matter of fact." *Id.* Rather, his "livid" comments reveal a general inquisition through innuendo, not a

17

"definite statement of a matter of fact." As for the innuendo being of such a nature to call for a reply, one need not engage in a debate with a "livid" individual to avoid the effect of having silence interpreted as admission. As said by Arthur Miller in *Death of a Salesman*: "Sometimes . . . it's better for a man just to walk away." That is what we are taught as the correct course of action in heated settings, and we do not read *Miller* as encompassing situations wherein one abides by that common-sense bit of wisdom. Simply put, the situation at hand is not "of such a nature as to call for a reply" on the part of Mogged or anyone else to whom Medlin was venting his anger. *See id.* at 190–91 (applying rule and finding that Dyess was the attorney for Middleton after Middleton stated he hired Dyess and Dyess remained silent); *see also Dodd v. Harper*, 670 S.W.2d 646, 650 (Tex. App.—Houston [1st Dist.] 1983, no writ) (applying rule to deny Dodd's claim against Harper's estate when Dodd did not deny the estate administrator's charge that his claim was based on an illegal contract); *Wenk v. City Nat'l Bank*, 613 S.W.2d 345, 349 (Tex. Civ. App.—Tyler 1981, no writ) (construing Wenk's failure to deny that the credit-card accounts were his as a tacit admission that they were when the evidence showed that he had received monthly account statements without complaint).

As for Lindamood's suggestion that because one may question Fletcher's credibility one can infer that he made the Alert, we note an absence of authority from Lindamood supporting the proposition. In effect, he suggests that because one cannot believe Fletcher when he denied his involvement, his lack of credibility is

18

evidence that he was involved. The credibility of a witness affects whether one should believe what he said. Lacking credibility, a witness's testimony on a particular matter is susceptible to rejection. But the ability to reject the witness's testimony about a fact is not evidence that the opposite fact exists if no other evidence supports its existence. Simply put, a negative is not evidence of a positive. *See In re E.V.*, 255 S.W.3d 389, 394 (Tex. App.—El Paso 2008, no pet.) (in reviewing a child-support order, the court held that "[a]lthough the trial judge doubted the credibility of Vieweg's tax returns and was familiar with the location and physical size of Vieweg's business, this does not constitute evidence that Vieweg's income was $1,950 per month").

Nor do we ignore Lindamood's attestation in his affidavit that someone at a PAC meeting informed him that "I told them not to use it," the "it" being the Alert. The same person also told Lindamood that he had seen the Alert at the same meeting. Assuming arguendo that the hearsay is competent evidence, it leaves us to speculate as to the relevant facts. For instance, were Mogged or Fletcher in attendance at the meeting? We cannot tell from the hearsay. If in attendance, did any of them voice support for the Alert? Again, we cannot tell from the hearsay. Without answers to those questions, the hearsay is no evidence that Mogged or Fletcher published or otherwise disseminated the Alert.

In short, our review of the record uncovered no clear and specific evidence establishing a prima facie case that either Mogged or Fletcher published the Alert and

19

its falsehoods. The same is not true of Taylor, however. He received Lindamood's deposition via an email attachment from an attorney who represented Lindamood's stepmother in an earlier probate dispute. Upon receiving it, he read the document, underlined certain passages within it, culled seven pages from it, disclosed the culled pages to various of his supporters, and informed them that it contained content detrimental to Lindamood. Obviously, Taylor had motive for using the information, given his desire to win the election. Furthermore, the Alert contained similarly, though not identically, underlined passages to those found in the Excerpt. So too did it disclose its source, which happened to be the very deposition sent to Taylor. While it may be that the attorney who emailed the deposition to Taylor also sent it to others who just happened to cull the same pages from the document which Taylor culled, we found no evidence of record suggesting that he did. Nor did we find evidence indicating that Taylor forwarded either the representative's email or the attachment thereto to others, and the absence of this evidence is somewhat significant given the attestation of Lindamood's expert. It was his "opinion that both documents [i.e., the Excerpt and the Alert] were manipulated from the same electronic source document." In other words, he concluded that both had been made from the same email attachment sent to Taylor.[7] Other affidavit evidence also indicated that Taylor not

---

[7]Aspects of the expert's multiple opinions are conclusory. Furthermore, conclusory opinions are not evidence. *Town of Flower Mound v. Stafford Estates, L.P.*, 71 S.W.3d 18, 47 n.23 (Tex. App.—Fort Worth 2002), *aff'd*, 135 S.W.3d 620 (Tex. 2004). Yet, in opining that the Alert had to have been made from the same email

only had the technical equipment and skills to create the Alert but also created political materials in the past having red highlights akin to the Alert. So too is there evidence that others have "heard Taylor use many times before" a rather unique expression found in the Alert: "the attorney drilled down on." Viewing this amalgam of evidence in a light most favorable to Lindamood, it would permit a factfinder to reasonably infer that Taylor authored the Alert, even though he expressly denied it. And because various statements in the Alert were false, then the third swing of the pendulum (i.e., the swing back in the direction of a viable affirmative defense) does not favor Taylor; he did not prove the defense of truth.

## Damages

Finally, if the false statement is defamatory per se, then nominal damages may be awarded without proof of actual injury. *Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017). Falsely accusing one of a crime or of engaging in serious sexual misconduct are examples of defamation per se. *Lipsky*, 460 S.W.3d at 596. To the extent that Lindamood was falsely accused of sexually assaulting a minor, the falsehood may be characterized as a defamation per se. Thus, at least nominal damages are recoverable by him.

---

attachment, Lindamood's expert explained, in paragraph 12 of his affidavit, the basis for his opinion. Given the explanation, his opinion was not the type of conclusion deemed incompetent. *See Rogers v. Zanetti*, 518 S.W.3d 394, 405 (Tex. 2017) (stating that to be competent, an expert's opinion must have a demonstrable and reasoned basis on which to evaluate it and "[t]his basis must come in the form of an answer to the question 'Why': Why did the expert reach that particular opinion?").

21

In short, sufficiently clear and specific evidence exists of record to establish a prima facie case on each element of Lindamood's claim that Taylor defamed him. The same cannot be said of the defamation claim founded upon the Alert and asserted against Mogged and Fletcher. Again, we encountered no evidence from which it could be reasonably inferred that they authored or assisted Taylor in authoring or disseminating the Alert. Further, the Excerpt was not defamatory.

Nor did we find evidence of a civil conspiracy to defame Lindamood between Taylor, Mogged, and Fletcher involving the dissemination of falsehoods about Lindamood. As said in *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214 (Tex. 2017), civil conspiracy requires a specific intent—"the parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement." *Id.* at 223 (quoting *Triplex Comm'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995)). Assuming arguendo that the object or course of action the group agreed to pursue was winning the election, Lindamood would be obligated to tender evidence that each was aware of the wrongful conduct (i.e., use of defamatory materials) at the inception of their combination. We found no evidence indicating that each participant was aware of the Alert or any other document containing falsehoods about Lindamood, much less of their intended use, when they first agreed to work towards Taylor's ultimate victory. Nor did we find evidence that the group was aware that falsehoods would be uttered against Lindamood as part of their effort towards electoral victory at

22

the inception of the effort. Thus, Lindamood failed to establish by clear and specific evidence a prima facie case illustrating that the group conspired to defame him.

### Forum Comment

Next, we address the last form of defamation raised by Lindamood encompassing Fletcher's written utterances within an internet forum. Therein, he asked whether voters should cast their ballot for a "sexual predator" or "ethical uncertainty." In making these remarks, he indicated that his source was a "deposition."[8] Lindamood contended that alluding to him as a sexual predator and as having uncertain ethics was a false statement of fact uttered with actual malice. We focus on the malice aspect of the argument.

Again, actual malice requires either knowledge that the statement was false or a reckless disregard for the truth. We find evidence of neither when viewed in the context of what was said and how it was said.

The deposition excerpts to which Fletcher was alluding can be fairly read as disclosing that Lindamood was in the presence or otherwise interacted with a prostitute while in Las Vegas. While he denied hiring a prostitute, he did not deny that one was present in a room with him and his friends. Those excerpts also reveal that he had fondled his stepsister when she was drunk. Despite his subsequent denial

---

[8]Fletcher later explained that the "deposition" consisted of "excerpts of Mr. Lindamood's deposition that [he] had read." Whether those excerpts were the ones created and distributed by Taylor (i.e., the Excerpt) is unclear.

that he was married at the time, the deposition and excerpts indicate otherwise. When asked whether he was "married then," he answered affirmatively.

Ethics encompass moral or aspirational ideals that should guide one's behavior, and we conclude that a reasonable person would deem that an accurate description of the concept. *See Ethics*, Webster's Third New International Dictionary (2002) (defining "ethics" to include "a group of moral principles or set of values" and "standards of behavior"). Interacting with a prostitute and fondling a drunk stepsister while married are matters that a reasonable person could deem as falling short of moral or aspirational ideals. In other words, Fletcher had factual bases upon which to insinuate that Lindamood engaged in unethical conduct. The comment having such bases in fact, we cannot say that Fletcher's words were uttered while knowing them to be false or with reckless disregard for their truth. *See Schofield*, 2017 WL 2180708, at *15–16 (holding that actual malice was negated due to evidence that the defendant believed her statements were true at the time uttered and evidence provided a plausible basis for that belief).

Much the same can be said with Fletcher's use of the phrase "sexual predator." Lindamood himself described the term as connoting someone who forces sex on an unwilling victim. That such unwillingness may come in various forms is indisputable. The law prohibits taking sexual advantage of a female whose decision-making processes or judgment is impaired by intoxicants is one such form. *See* Tex. Penal Code Ann. § 22.011(b)(5). At the very least, it is reasonable for an ordinary person to

24

so believe. Here, Lindamood acknowledged within the deposition excerpts distributed to Fletcher, that his stepsister was indeed drunk when placing his hands on her breasts, when she removed her bra and threw it upon a table, when she went to lie on a couch, when he left his bed to join her on that couch, and when he pulled her shirt up and began touching her thighs. He also acknowledged, under oath, her telling him the morning after that "what you did was wrong." That led to him accusing her of being the aggressor, or as he put it, "you're the one who [led] it up to that."

The same deposition describes another incident involving sexual activity wherein Lindamood blamed the female as the instigator. It apparently occurred in Branson, Tennessee, and involved his "climb[ing] into the bed with them [sic] and put[ting] [his] hand on their [sic] thigh." Allegedly, he did so because "somebody had asked" him to do it. Whether that person also was drunk went unaddressed.

Interacting with prostitutes because "it was to be funny," sexual promiscuity, and fondling a drunk stepsister who later protested adds plausibility or factual bases to Fletcher's characterization of Lindamood as a sexual predator. This is not to say that Lindamood actually fit his own definition of the term. It is to say that Fletcher's comments were derived from Lindamood's actual words. Those words depicted a willingness to take advantage of sexually charged situations even though the affected party may suffer from impaired judgment.

Actual malice refers to the defendant's "attitude toward the truth of what [was] said." *Vecchio v. Jones*, No. 01-12-00442-CV, 2013 WL 3467195, at *10 (Tex. App.—

25

Houston [1st Dist.] July 9, 2013, no pet.) (mem. op.). Given the content of the deposition, we are unable to say that Lindamood established a prima facie case that Fletcher's attitude toward the truth was of the ilk constituting actual malice. In other words, he did not present clear and specific evidence to establish a prima facie case that Fletcher knew his statements were false or that he recklessly disregarded their truthfulness. *See Schofield*, 2017 WL 2180708, at *15.[9]

In sum, the trial court erred by dismissing Lindamood's claim of defamation against Taylor. It did not err in dismissing JR's Demolition's suit for defamation. Nor did it err in dismissing the defamation suit against Mogged and Fletcher. This renders difficult our consideration of the attorney's fees and sanction awarded Taylor, Mogged, and Fletcher and the absence of findings of fact and conclusions of law. The availability of fees and sanctions were statutorily dependent upon the dismissal of Lindamood's defamation suit against the party moving for dismissal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a) (West 2015) (stating that "[i]f the court orders dismissal of a legal action under this chapter, the court shall award to the moving party: (1) court costs, reasonable attorney's fees, and other expenses . . . and (2) sanctions"). Three parties moved for dismissal and two (Mogged and Fletcher) were entitled to same. Yet in awarding fees and sanctions, the trial court did not differentiate between the three movants, the respective amount of attorney's fees

---

[9]Because the forum comments said nothing of JR's Demolition, they failed to defame that entity.

26

incurred by each movant, or the amount of sanction awardable to each movant. Nor did the movants engage in such differentiations. Because those matters generally encompass issues of fact that we may not resolve, *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating that though a court of appeals may "unfind" facts, it cannot make original findings of fact), we must remand the question of fees and sanctions to the trial court.

We do note, however, that one topic raised by Mogged and Fletcher remains relevant since it is likely to arise on remand. It involves the obligation of the trial court to issue findings of fact and conclusions of law regarding the amount of attorney's fees and sanctions it ultimately awarded. They contend that the trial court had an obligation to issue them and erred when it did not. To the extent that section 27.009(a) entitles Mogged and Fletcher to attorney's fees and sanctions, we address their contention. *See Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex. 1997) (addressing a point that need not be addressed because it was likely to arise on remand); *Nu-Way Energy Corp. v. Delp*, 205 S.W.3d 667, 684 (Tex. App.—Waco 2006, pet. denied) (stating that "[e]ven though we will remand for reconsideration of the attorney's fee award, we also address the remaining issues because they are likely to arise on remand"), *cert. denied*, 552 U.S. 1039 (2007).

First, the request for findings was made pursuant to Texas Rule of Civil Procedure 296. According to that rule, a party may ask for the trial court "to state in writing its findings of fact and conclusions of law." Tex. R. Civ. P. 296. The rule's

purpose is to "give a party a right to findings . . . and conclusions . . . finally adjudicated after a conventional trial on the merits before the court." *IKB Indus. (Nigeria) Ltd v. Pro-Line Corp.*, 938 S.W.2d 440, 442 (Tex. 1997); *Dinkins v. Calhoun*, No. 02-17-00081-CV, 2018 WL 2248572, at *9 (Tex. App.—Fort Worth May 17, 2018, no pet.) (mem. op.) (quoting *IKB Indus.*, 938 S.W.2d at 442). In cases other than those tried on the merits by the court, such findings and conclusions may be proper, but a party is not entitled to them. *IKB Indus.*, 938 S.W.2d at 442 (holding that while findings for imposing sanctions for discovery abuse may be helpful, they are not required); *accord Dinkins*, 2018 WL 2248572, at *9 (holding that because trial on the merits was to a jury and the court decided the post-trial sanctions and easement motions, the trial court was not obligated to issue findings of fact and conclusions of law). No conventional trial on the merits was held here. Rather, the matter of sanctions and attorney's fees was submitted to the trial court via motion. So, while the existence of findings of fact and conclusions of law may have been helpful, their issuance was not required.

Second, an award of attorney's fees is reviewed under the standard of abused discretion. *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016). The same is true of a decision to levy sanctions, *Dinkins*, 2018 WL 2248572, at *4, and to assess court costs. *Ray v. McFarland*, 97 S.W.3d 728, 730 (Tex. App.—Fort Worth 2003, no pet.). We say this because when an issue is reviewed under the standard of abused discretion, findings of fact and conclusions of law may be helpful, but "they are not

28

required." *Haddock v. Quinn*, 287 S.W.3d 158, 169 n.2 (Tex. App.—Fort Worth 2009, pet. denied). So at bar, the trial court had no obligation to accede to the request for findings of fact and conclusions of law.

We reverse in part the trial court's "Order on Motion to Dismiss" as to Lindamood's defamation claim against Taylor and remand that claim to the trial court for further proceedings. We affirm the remainder of the "Order on Motion to Dismiss." Next, we reverse the "Order on Attorneys' Fees, Costs, Expenses, and Sanctions Pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 27.009" and remand the issue of attorney's fees, sanctions, and court costs awardable to Mogged and Fletcher to the trial court.

/s/ Brian Quinn
Brian Quinn
Chief Justice

Delivered: December 31, 2018